**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE
CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING
EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA
In The Court of Appeals**

Barbara L. Sarb, Respondent/Appellant,

v.

Julie W. Phillips and Joseph M. Phillips,
Appellants/Respondents.

Appellate Case No. 2023-001713

———————

Appeal From Florence County
H. Steven DeBerry, IV, Circuit Court Judge

———————

Unpublished Opinion No. 2025-UP-302
Heard May 8, 2025 – Filed August 27, 2025

———————

**AFFIRMED IN PART, REVERSED IN PART, AND
REMANDED**

———————

Valerie Garcia Giovanoli, of McCabe, Trotter & Beverly,
P.C., and Fiona R. Reed, of Miller, Dawson, Sigal &
Ward, LLC, both of Columbia, for
Respondent/Appellant.

Edward Andrew Love and Robert Thomas King, both of
King, Love & Hupfer, LLC, of Florence, for
Appellants/Respondents.

———————

**PER CURIAM:** In June 2019, Dr. Barbara Sarb (Buyer) and Julie and Joseph Phillips (collectively, Sellers) entered into a contract (the Purchase Agreement) for the sale of a home in Florence (the Property). Paragraph 8 of the Purchase Agreement sets forth the procedure for any repairs requested by Buyer. It also states, "Buyer at Buyer's expense shall have the privilege and responsibility of inspecting the structure['s] . . . plumbing systems, . . . [and] waste water systems." Paragraph 9 of the Purchase Agreement is titled "INSPECTION/REINSPECTION RIGHTS" and states "Buyer and SC licensed and insured inspectors ("Inspectors") reasonably perform any reasonable ultimately non-destructive examination and make reasonable record of the Property . . . ." It further provides that "Buyer and persons they choose may make reasonable visual observations of Property." Paragraph 23 of the Purchase Agreement states, in part,

> If Buyer defaults in the performance of any of the
> Buyer's obligations under this Contract ("Default"),
> Seller may:
>
> (i)     Deliver Notice of Default to Buyer and terminate Contract; and
>
> (ii)    Pursue any remedies available to Seller at law or equity; and
>
> (iii)   Recover attorneys' fees and all other direct costs of litigation if Buyer found in default/breach of Contract.

As required by the Residential Property Condition Disclosure Act (the Act),[1] Sellers provided Buyer with a Residential Property Condition Disclosure Statement (the Disclosure Statement) representing that they did not have actual knowledge of any "defects, malfunctions, damages, conditions or characteristics" with the Property. The Disclosure Statement contained a standard provision stating it did not "limit the obligation of the purchaser to inspect the property and improvements which are the subject of the real estate contract."

Prior to and shortly after moving in, Buyer experienced issues with the Property, including (1) flooding in the basement, (2) problems with sewage disposal systems and plumbing, and (3) an infestation of cockroaches. Buyer filed a complaint against Sellers, claiming (1) a violation of the Act; (2) fraud; (3) constructive fraud; (4) negligent misrepresentation; (5) negligence, gross negligence, and negligence per se; (6) breach of contract/breach of implied covenant of good faith

---

[1] S.C. Code Ann. §§ 27-50-10 et seq. (2007 & Supp. 2024).

and fair dealing; and (7) breach of contract/breach of implied covenant of good faith and fair dealing accompanied by a fraudulent act. Sellers filed an answer asserting multiple defenses and counterclaims, including a claim for "Breach of Contract—Failure to Inspect."[2]

At trial, Buyer testified that before entering into the Purchase Agreement, she personally inspected the house with her realtor, John Etheridge. After entering into the Purchase Agreement and before closing, Buyer visited the Property "[f]ive or six" times and never noticed any issues with the house. Buyer hired two companies to inspect the Property to ensure "there w[ere] no major structural problems prior" to closing. She explained the first inspection was a CL-100 inspection, which is used to check for wood infestation and pests. Buyer stated the CL-100 revealed (1) no "pest infestations or wood destroying infestations"; (2) no "wood destroying pests"; (3) no concerns about standing water or groundwater infiltration; and (4) that non-active wood destroying fungi were present. She explained the CL-100 revealed some evidence of "[w]ater/moisture related" "[w]ood/decay damage" in "various locations to sub fascia"—but this damage was located "under the overhead of the roof" and "nowhere near the basement." The CL-100 also revealed "[w]ood/decay damage [wa]s evident to the window trim and window stool at the rear right side of the basement" and was "water/moisture related."

Buyer testified the second inspection was a home inspection by HouseMaster, which inspected "the rooms in the house, the outside, the basement, and the crawl space"; the inspector detailed his findings in a report (the HouseMaster report). HouseMaster reported similar findings to those found in the CL-100. It also noted decay in the basement windows because one window was level with the ground, and it recommended replacing the vinyl on the window. The HouseMaster report did not contain "any finding or indication that there was actually water in the" basement area, but it recommended "reach[ing] out to the prior owner about whether there was any type of water penetration." Buyer explained she requested that Etheridge ask Sellers whether there was "any water in the" house; Sellers responded that "water never came into the house."[3]

After reviewing the reports, Buyer and Etheridge created a Residential Repair

---

[2] This was the only counterclaim heard by the jury.

[3] Etheridge also testified that he called Sellers' broker to ask whether there had been any water in the basement, and Sellers "relay[ed]" to him that there had not been any "water problems in the house."

Addendum Agreement (the Addendum) requesting that Sellers repair some of the issues noted in the inspections prior to closing.  Sellers agreed to most of the requested repairs and accepted the estimate from Buyer's contractor, John Sims.  Buyer testified the estimate from Sims addressed the issues noted in the inspections and that the repairs would "cover everything."  She stated she closed on the Property, Sellers credited her the estimated cost of the repairs, and Sims completed the repairs.

Buyer moved into the Property around August 26.  She testified she purchased the Property during a dry summer.  However, Buyer presented evidence that the area received almost two inches of rain on August 16 and August 17, and she testified that when she went to check on the Property on August 18, the basement was flooded with "several inches of water."  Buyer claimed there was consistently standing water in the basement over the next year and the flooding occurred "[a]ny time there was a moderate amount of rain."  She moved out of the Property in December of that year because of the high moisture levels and the related health issues she was experiencing.

Buyer also testified that shortly after moving in, she started noticing "mud that came out of the drain" in the shower, the toilet water "breathing," the sinks draining slowly, and some minor leaks in the bathrooms.  She explained she called a plumber but the issues got worse; she could not flush the toilets or drain the sinks and everything "backed up."  Buyer testified a different plumber came to inspect and told her the sewer "pipe that went from [the Property] to the street was clogged" and there was a "hole in the PVC pipe" that measured approximately four inches by two inches where someone had previously attempted to clean it out.  She explained the sewer pipe was also at "a reverse slope," meaning the sewage backed up into the Property; the plumber told her the sewer pipe needed to be replaced.  In December, the plumber replaced the sewer pipe.

Buyer explained when she moved into the Property, Sims recommended replacing some paneling board on the walls with drywall.  While removing the paneling, Sims found "live and dead cockroaches," "cockroach feces[,] and cocoons" inside the walls.  Buyer stated it was a "severe infestation" located in multiple rooms, and she saw "about twenty roaches a day."  She hired a pest control company to treat the infestation.

Glenn Stewart, an expert in civil engineering and building evaluation, inspected the Property in February of 2020 and found "water staining . . . on the backside of the crawlspace foundation wall" and discovered that the base of a door frame in the basement was decaying because of the "presence" of water for prolonged periods.

He opined the condition existed prior to Buyer purchasing the Property. Stewart explained neither inspection report indicated any evidence of water intrusion in the basement.

Julie Phillips testified Sellers had "water in [their] basement on two occasions" while they lived at the Property; however, she admitted they did not disclose this issue on the Disclosure Statement. She further testified they had "maybe three to four sewage issues" because of items that were improperly flushed down the toilet while living at the Property, but she also did not disclose those issues to Buyer in the Disclosure Statement. Julie explained they were not aware of "any pests" in their home.

Sellers moved for a directed verdict at the close of Buyer's case, arguing there was sufficient evidence that Buyer was made aware of any potential issues after receiving the inspections, and because she was on notice of those issues, she could no longer rely on the lack of information in the Disclosure Statement. The court reserved its ruling. After Sellers rested their case, Buyer moved for a directed verdict as to Sellers' counterclaim. Buyer argued there was insufficient evidence to prove this claim because (1) she never had a duty—only a right—to inspect and (2) she did any due diligence required of her by getting the "standard and customary" inspections. Sellers argued there is a right to inspect, but once a buyer invokes the right to inspect, the buyer "must follow the process and adequately inspect the property." They asserted Paragraph 8 of the Purchase Agreement required Buyer to "adequately inspect to find the issues" and she breached that duty. According to Sellers, the Disclosure Statement was "merged into" the Purchase Agreement; Buyer disagreed. The trial court stated whether Sellers filled out the Disclosure Statement in a "misrepresenting way" was a question of fact for the jury to decide.

The jury found Sellers violated the Act. They awarded Buyer $70,000 in damages. The jury also found Buyer liable for failing to adequately inspect. At first, the jury awarded Sellers damages of $0. The court instructed the jury that "there must be some damage" if they found Buyer liable, and the jury returned an award of $1,000.

Buyer filed a motion for JNOV, arguing (1) Buyer had no duty to "adequately inspect," (2) Sellers failed to prove Buyer breached that duty, and (3) Sellers failed to prove recoverable damages as a result of that breach. Sellers also filed a motion for JNOV, or alternatively for a new trial, arguing that (1) the jury failed to find Sellers made a misrepresentation, which is an "essential element of the Act;" and (2) the verdict was unsupported by the evidence in that Buyer had no right to rely on the Disclosure Statement. The trial court denied both motions.

Buyer filed a motion for attorneys' fees and costs, requesting $183,347.40 in attorneys' fees and $6,395.84 in court costs. Her motion addressed the six *Baron*[4] factors. Sellers also filed a motion, requesting $55,393.00 in attorneys' fees and $2,310.11 in costs. Their motion also discussed the *Baron* factors.

Sellers filed a notice of appeal, arguing the trial court erred in denying their motion for JNOV or new trial. Buyer filed a notice of cross-appeal as to the trial court's denial of her motion for JNOV. Two weeks later, the trial court issued an order awarding (1) Buyer attorneys' fees of $55,393 and costs of $6,395.84; and (2) Sellers attorneys' fees of $55,393 and costs of $2,310.11. The order stated it took "all six [*Baron*] factors into consideration," finding (1) the matter was not complex and did not take "an inordinate amount of time to conclude," (2) the professional standing of all attorneys was high, and (3) the fees and costs submitted were reasonable. Buyer filed a notice of appeal as to the order granting fees and costs. Sellers filed a notice of cross-appeal regarding fees and costs.

## ANALYSIS

### 1. JNOV motions

#### a. Sellers's JNOV motion

First, in the light most favorable to Buyer, we hold there was sufficient evidence for the jury to have found Sellers failed to disclose the issues they knew existed with the Property. *See Elam v. S.C. Dep't of Transp.*, 361 S.C. 9, 27-28, 602 S.E.2d 772, 782 (2004) ("When reviewing the denial of a motion for directed verdict or JNOV, an appellate court must employ the same standard as the trial court by viewing the evidence and all reasonable inferences in the light most favorable to the nonmoving party."); *Steinke v. S.C. Dep't of Lab., Licensing & Regul.*, 336 S.C. 373, 386, 520 S.E.2d 142, 148 (1999) ("The trial court must deny the motions when the evidence yields more than one inference or its inference is in doubt."). Julie testified that water infiltrated their basement on two different occasions while they owned the Property. She admitted they did not disclose this on the Disclosure Statement. Robin Hatchell, Sellers' neighbor when they owned

---

[4] *Baron Data Sys., Inc. vs. Loter*, 297 S.C. 382, 384-85, 377 S.E.2d 296, 297 (1989) (finding the court must consider six factors when awarding attorneys' fees: (1) the nature, extent, and difficulty of the legal services rendered; (2) the time and labor necessarily devoted to the case; (3) the professional standing of counsel; (4) the contingency of compensation; (5) the fee customarily charged in the locality for similar legal services; and (6) the beneficial results obtained).

the home, testified that when she went to the Property to check on Sellers' cat around 2016 or 2017, there was standing and flowing water in the basement. She explained Joe Phillips was in the basement at the same time. Additionally, Julie testified they had "maybe three to four sewage issues" while living at the Property but they also did not disclose those issues in the Disclosure Statement. However, Buyer testified the plumber explained the sewer pipe looked as if someone had tried to unclog it. She further explained that the sewer pipe was reverse sloped, and, therefore, the sewage backed up in the pipes. We find the evidence yields more than one reasonable inference regarding whether Sellers knew about any of these issues and failed to disclose them. *See* § 27-50-65 ("An owner who knowingly violates or fails to perform any duty prescribed by any provision of [the Act] or who discloses any material information on the disclosure statement that he knows to be false, incomplete, or misleading is liable . . . .").

While we acknowledge Sellers' reliance on *McLaughlin v. Williams*,[5] there are key distinctions in this case. First, McLaughlin sued Williams for fraud and negligent misrepresentation, both of which contain a reliance element. 379 S.C. at 458-59, 665 S.E.2d at 671-72. Here, the Act does not require a similar reliance element. Further, this court found McLaughlin was "clearly" informed of the "moisture damage" in the house before closing. *Id*. at 458-59, 665 S.E.2d at 671. The CL-100 McLaughlin obtained revealed active wood-destroying fungi[6] in the house and a high wood moisture content below the first main floor. *Id*. at 455, 665 S.E.2d at 669. Here, it is not as clear that Buyer was put on notice of any groundwater infiltration in the basement before closing. We acknowledge the HouseMaster report indicated water intrusion in the front crawl space, and the CL-100 mentioned dry staining around the plumbing sub-structure due to past leaks as well as "[w]ood decay/damage" to the windows and door frame in the basement. However, the CL-100 indicated "*non-active* wood-destroying fungi," and a contractor hired by Sellers noted the fungi was "superficial in nature with no structural damage." Stewart testified the HouseMaster report did not indicate any evidence of moisture intrusion in the basement and indicated any wood decay near the basement was classified "non-active." He also stated the CL-100 did not identify any concerns about standing water or groundwater infiltration. Additionally, Stewart—the only person who testified as to evidence of prior decay to the basement door frame—was not involved in the action until *after* closing. Further, in *McLaughlin*, the disclosure statement left "several items [] blank and

---

[5] 379 S.C. 451, 665 S.E.2d 667 (Ct. App. 2008).
[6] *McLaughlin* explained "fungi damage to wood" is "commonly called water damage." *Id.* at 459, 665 S.E.2d at 671.

there were no explanations for certain items, indicating possible problems." *Id.* at 454, 665 S.E.2d at 669. Here, the Disclosure Statement was fully completed and affirmatively indicated there were no issues with the Property. Buyer and Etheridge testified that, after the inspections were completed, Etheridge received confirmation from Sellers that there were no prior issues with water in the basement. Moreover, there was ample testimony that the basement would flood after periods of heavy rain and that Buyer purchased the house during a dry summer. Therefore, we find that *McLaughlin* can be distinguished because (1) the Act does not require reliance, as the claims in that case did, and (2) the inspection reports did not put Buyer notice of the specific issues she experienced, unlike the reports in *McLaughlin*. Accordingly, we hold the trial court did not err in denying the motion, and we affirm as to this issue.

### b. Buyer's JNOV motion

We hold the court erred by denying Buyer's JNOV motion as to Sellers' counterclaim for failing to adequately inspect. *See Elam*, 361 S.C. at 27-28, 602 S.E.2d at 782 ("When reviewing the denial of a motion for directed verdict or JNOV, an appellate court must employ the same standard as the trial court by viewing the evidence and all reasonable inferences in the light most favorable to the nonmoving party."); *id.* at 28, 602 S.E.2d at 782 ("The appellate court will reverse the trial court only where there is no evidence to support the ruling below."). Sellers allege Buyer had a duty to adequately inspect under the Purchase Agreement and the Disclosure Statement. They argue Buyer did not "adequately inspect" because she only obtained the "standard home inspection[s]" without follow-up inspections; therefore, Buyer breached the contracts. We disagree.

First, we find Buyer did not have an *obligation* to adequately inspect the property under the Purchase Agreement or the Disclosure Statement and Seller did not provide any evidence to support that claim. *See Branche Builders, Inc. v. Coggins*, 386 S.C. 43, 48, 686 S.E.2d 200, 202 (Ct. App. 2009) ("The elements for breach of contract are the existence of the contract, its breach, and the damages caused by such breach."); *Ellie, Inc. v. Miccichi*, 358 S.C. 78, 93, 594 S.E.2d 485, 493 (Ct. App. 2004) ("In construing a contract, the primary objective is to ascertain and give effect to the intention of the parties."); *id.* at 94, 594 S.E.2d at 493 ("To discover the intention of a contract, the court must first look to its language—if the language is perfectly plain and capable of legal construction, it alone determines the document[']s force and effect."). Paragraph 9 of the Purchase Agreement is entitled "Inspection Rights." This provision affords Buyer the *opportunity* to inspect the property if she so chooses. Although Paragraph 8 provides that Buyer has the privilege *and* responsibility to inspect, this section sets forth the procedure

for any requested repairs and nothing in the Purchase Agreement requires Buyer to conduct the inspection in a certain way.  The Disclosure Statement explains it does not "limit the obligation of the purchaser to inspect the property and improvements which are the subject of the real estate contract."  We do not interpret this provision as creating a responsibility to conduct an adequate inspection—only that the Disclosure Statement does not allow Buyer to solely rely on the disclosures made by Sellers.

Second, even if Buyer did have an obligation to inspect under the Purchase Agreement or Disclosure Statement, we find she conducted an adequate inspection. Buyer personally inspected the Property numerous times with her realtor, and Sellers indicated there were no issues with the Property in the Disclosure Statement.  Buyer hired two different companies to conduct a home inspection and a CL-100 inspection, which Sellers admit are "standard."  After one inspection indicated Buyer should ask Sellers whether there had been previous issues with water damage, Buyer did inquire and Sellers verbally confirmed there were no issues.  Additionally, Buyer hired Sims, a contractor, to make repairs that "cover[ed] everything" from the inspections.  Accordingly, we hold Buyer did not breach the Purchase Agreement or the Disclosure Statement, and therefore the court erred by denying Buyer's JNOV motion as to Sellers' counterclaim.

## 2. Attorneys' fees and court costs

### a. Sellers' fees and costs under the Purchase Agreement

We find the trial court erred in awarding Sellers attorneys' fees and costs under the Purchase Agreement.  *See Baron*, 297 S.C. at 384, 377 S.E.2d at 297 ("Where there is a contract, the award of attorney[s'] fees is left to the discretion of the trial [court] and will not be disturbed unless an abuse of discretion is shown."). Paragraph 23 of the Purchase Agreement states, in part, "*If* Buyer defaults in the performance of any of the Buyer's obligations under this [Purchase Agreement] ("Default"), Seller *may* . . . [r]ecover attorneys' fees and all other direct costs of litigation *if* Buyer found in default/breach of [Purchase Agreement]."  Accordingly, Sellers are not entitled to fees and costs unless Buyer was found to have violated the Purchase Agreement.  *See Blumberg v. Nealco, Inc.*, 310 S.C. 492, 493, 427 S.E.2d 659, 660 (1993) ("The general rule is that attorney[s'] fees are not recoverable unless authorized by contract or statute.").  As explained above, we hold the trial court should have granted Buyer's JNOV motion as to Sellers' counterclaim because Buyer did not breach the Purchase Agreement; therefore,

Sellers are not entitled to fees. Accordingly, we reverse as to this issue.[7] *See Myers v. Myers*, 391 S.C. 308, 321, 705 S.E.2d 86, 93 (Ct. App. 2011) (explaining "it is not improper for this court to reverse an attorney[s'] fees award when the substantive results achieved by trial counsel are reversed on appeal"); *Ex parte Lipscomb*, 398 S.C. 463, 471, 730 S.E.2d 320, 324 (Ct. App. 2012) (reversing an award of attorneys' fees "[b]ecause the award of attorney[s'] fees was predicated on the [trial] court's finding of contempt," which was also reversed).

### b. Buyer's fees and costs under the Act

### i. Sellers' cross-appeal

The Act allows the trial court to "award reasonable attorney[s'] fees incurred by the prevailing party." § 27-50-65. We hold the trial court did not err in awarding Buyer attorneys' fees and costs because the plain meaning of "prevailing party" in the Act refers to the party who prevails *under* the Act. *See Citizens for Quality Rural Living, Inc. v. Greenville Cnty. Plan. Comm'n*, 426 S.C. 97, 102, 825 S.E.2d 721, 724 (Ct. App. 2019) ("As to questions of law, this court's standard of review is de novo."); *State v. Sweat*, 386 S.C. 339, 350, 688 S.E.2d 569, 575 (2010) ("The [c]ourt should give words 'their plain and ordinary meaning without resort to subtle or forced construction to limit or expand the statute's operation.'" (quoting *Sloan v. S.C. Bd. of Physical Therapy Exam'rs*, 370 S.C. 452, 469, 636 S.E.2d 598, 607 (2006)), *overruled on other grounds by Joseph v. S.C. Dep't of Lab., Licensing & Regul.*, 417 S.C. 436, 790 S.E.2d 763, (2016)). Because the jury found Sellers violated the Act, Buyer is the prevailing party here. *Seckinger v. Vessel Excalibur*, 326 S.C. 382, 388, 483 S.E.2d 775, 777-78 (Ct. App. 1997) ("[O]ur supreme court

---

[7] Sellers argue the issue of whether the trial court properly awarded them fees and costs is not preserved because Buyer never challenged whether the jury properly found that Buyer breached the Purchase Agreement. However, we do not need to address the issue of whether Buyer sufficiently raised this argument at trial and decline to do so. As explained above, we find the trial court should have granted Buyer's motion for JNOV as to Sellers' counterclaim. Therefore, Sellers are not entitled to fees and an analysis regarding whether Buyer raised the issue at trial is unnecessary. Additionally, Buyer argues the court abused its discretion in awarding attorneys' fees and costs to Sellers because the amount was unreasonable under *Baron*. Because we reverse the award of fees and costs in its entirety, we need not reach this issue. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (ruling an appellate court need not address remaining issues when its resolution of a prior issue is dispositive).

has defined a 'prevailing party' as '[t]he one who successfully prosecutes the action or successfully defends against it, prevailing on the main issue, even though not to the extent of the original contention [and] is the one in whose favor the decision or verdict is rendered and judgment entered.'" (alteration in original) (quoting *Heath v. County of Aiken*, 302 S.C. 178, 182-83, 394 S.E.2d 709, 711 (1990))).

Further, we hold the trial court did not err in awarding Buyer costs because it is permitted under Rule 54, SCRCP, and the Act expressly allows them. *See* Rule 54(d), SCRCP ("Except when express provision therefor is made either in a statute or in these rules, costs shall be allowed as of course to the prevailing party unless the court otherwise directs[].");  § 27-50-65 ("An owner who knowingly violates or fails to perform any duty prescribed by any provision of this article or who discloses any material information on the disclosure statement that he knows to be false, incomplete, or misleading is liable for actual damages proximately caused to the purchaser *and court costs*." (emphasis added)).  Accordingly, we affirm as to this issue.

### ii.    Buyer's appeal

We find the trial court abused its discretion in determining the fee amount it awarded to Buyer.  *See Kiriakides v. Sch. Dist. of Greenville Cnty.*, 382 S.C. 8, 20, 675 S.E.2d 439, 445 (2009) ("[T]he specific amount of attorneys' fees awarded pursuant to a statute authorizing reasonable attorneys' fees is left to the discretion of the trial [court] and will not be disturbed absent an abuse of discretion." (quoting *Layman v. State*, 376 S.C. 434, 444, 658 S.E.2d 320, 325 (2008))); *id.* ("An abuse of discretion occurs when the conclusions of the trial court are either controlled by an error of law or are based on unsupported factual conclusions." (quoting *Layman*, 376 S.C. at 444, 658 S.E.2d at 325)).  While the trial court's order purported to have taken all six *Baron* factors into consideration, the order consisted of a brief discussion of only three: (1) finding the case was not "extremely complex" or time consuming, (2) asserting the attorneys' professional standing was "exceptionally high," and (3) finding the fees were reasonable.  *See Baron*, 297 S.C. at 384, 377 S.E.2d at 297 ("In awarding reasonable attorney's fees, there are six factors to be considered."); *Blumberg*, 310 S.C. at 494, 427 S.E.2d at 660 (explaining the six factors are: "1) nature, extent, and difficulty of the legal services rendered; 2) time and labor devoted to the case; 3) professional standing of counsel; 4) contingency of compensation; 5) fee customarily charged in the locality for similar services; and 6) beneficial results obtained"); *Goethe v. Cleland*, 323 S.C. 50, 55, 448 S.E.2d 574, 577 (Ct. App. 1994) (holding the court satisfied the requirements under *Blumberg* when it "discussed the six factors relevant to a determination of fees, and made findings in support of each factor").  Additionally, we did not find

evidence in the record to support the court's award. *See Brawley v. Richland County*, 445 S.C. 80, 94-95, 911 S.E.2d 156, 163-64 (Ct. App. 2025) (reversing the fee award made by a trial court when this court could not "discern how the [trial] court came to the" award amount and the order awarding the fees "directly contradict[ed] the record"), *cert. denied* (June 3, 2025); *Horton v. Jasper Cnty. Sch. Dist.*, 423 S.C. 325, 330-31, 815 S.E.2d 442, 445 (2018) (reversing the trial court after it made "general findings" as to four *Baron* factors that appeared to support the affidavit of Horton's counsel but "provided no explanation and cited no evidence in the record to support its conclusion that [its awarded rate] was reasonable"). Here, the trial court awarded Buyer and Sellers the same amount of attorneys' fees, which was the amount Sellers requested. However, the court did not explain the method it used to determine the amount or why it awarded the parties equal amounts, despite the attorneys charging different hourly rates and reporting different numbers of hours billed. It is not clear if the trial court awarded Buyer a lesser amount because it found the hourly rate for Buyer's attorney was excessive or the number of hours billed was excessive or for some other reason. In fact, the court found the fees requested were reasonable. Furthermore, the parties received different verdicts and damages awards from the jury—a factor not seemingly contemplated by the court's fee award. Because there is no explanation of how the trial court determined the amount and there is a lack of evidence in the record to support the determination, we hold the court erred. *See Blumberg*, 310 S.C. at 494, 427 S.E.2d at 661 ("On appeal, absent sufficient evidentiary support on the record for each factor, the award should be reversed and the issue remanded for the trial court to make specific findings of fact."); *Horton*, 423 S.C. at 331, 815 S.E.2d at 445 (finding the court "provided no explanation and cited no evidence in the record to support its conclusion that [the rate it awarded] was reasonable" and "[i]n the absence of any evidence to support the rate," the trial court abused its discretion). Moreover, because we reverse the award of fees to Sellers, the award of fees to Buyer should be recalculated.[8] Therefore, we reverse Buyer's fee award and remand for the trial court's determination of the fee amount.[9]

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

**WILLIAMS, C.J., and GEATHERS and TURNER, JJ., concur.**

---

[8] Our ruling is based on the methodology of the fee award, not the award amount.
[9] Buyer additionally raises a public policy argument. However, because we reverse and remand the determination of Buyer's fees, we need not reach this issue. *See Futch*, 335 S.C. at 613, 518 S.E.2d at 598 (ruling an appellate court need not address remaining issues when its resolution of a prior issue is dispositive).